UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EDWIN CHIEDU OBIORAH,

                              Movant,

                 -v.-

UNITED STATES OF AMERICA,

                              Respondent.

---

13 Civ. 7199 (KPF)

Related Case: 10 Cr. 951 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

        Movant Edwin Chiedu Obiorah filed a motion to vacate, set aside, or

correct his sentence pursuant to 28 U.S.C. § 2255, claiming ineffective

assistance of counsel in connection with his guilty plea.  The initial motion was

filed *pro se*; it was later replaced by a counseled motion,[1] which in turn was

followed by extensive briefing from both sides, several rounds of written and

oral argument, and a hearing at which Mr. Obiorah and his prior counsel,

Donald Yannella, testified.  After considering at length the written and oral

submissions of the parties, this Court finds that Mr. Obiorah did not receive

ineffective assistance of counsel in the runup to his guilty plea, and

consequently denies his Section 2255 motion.

---

[1]        The Court pauses to extend its appreciation to the firm of Kirkland & Ellis LLP, for its
excellent work in representing Mr. Obiorah.

## FACTUAL BACKGROUND[2]

The parties have divergent views of Mr. Obiorah's underlying offense conduct, and thus the Court begins by summarizing both sides' positions.[3] According to Mr. Obiorah, he was employed during the relevant time period in the import/export business, principally exporting clothing and marble tiles from South America and various African countries.  (Dkt. #19 at 3).  In or about 2009, Mr. Obiorah was introduced to two gentleman from Colombia, known to him as "El Negro" (whom the Government identified as Jose Mosquera-Prado) and "El Sobrino"/"Jose" (whom the Government identified as Alexander Young).[4]  According to Mr. Obiorah,

> Around this time, in 2009, El Negro attempted to involve Obiorah in a failed drug deal with a Nigerian national living in Spain, which resulted in a robbery of the

---

[2]    Given their number, the Court will cite to the parties' submissions by their docket entry and will use the page numbers assigned by this Court's electronic case filing ("ECF") system.  The Court uses "Dkt." to refer to the docket in this case; "Crim. Dkt." to refer to the docket in the related criminal case, *United States* v. *Obiorah*, No. 10 Cr. 951 (HB); and "App. Dkt." to refer to the docket in Mr. Obiorah's direct appeal to the United States Court of Appeals for the Second Circuit, *United States* v. *Obiorah*, No. 12-3710.

[3]    The Government protests that Mr. Obiorah's written submissions comprise "unsupported statement of facts" with only "a handful of citations to the record."  (Dkt. #21 at 9).  The Court observes that many of Mr. Obiorah's statements lack corroboration, though he has been largely consistent in his recounting of certain events.

[4]    For ease of reference, the Court will at times refer to these and other related individuals as Mr. Obiorah does, by their nicknames.

Mr. Mosquera-Prado was named in a sealed superseding indictment in this District dated September 2, 2009, that charged him and six co-defendants with narcotics distribution and importation offenses.  *See United States* v. *Nunez-Fermin, et al.*, No. 09 Cr. 723 (LAK), Dkt. #6.  According to the docket in that case, Mr. Mosquera-Prado was presented in this District on January 21, 2011, after being extradited from Colombia.  (No. 09 Cr. 723 (LAK), Minute Entry for January 21, 2011).  He was convicted on both counts of the indictment after a jury trial that concluded on October 18, 2011, and was sentenced principally to concurrent terms of 280 months' imprisonment.  *See generally United States* v. *Mosquera-Prado*, 554 F. App'x 54, 55-56 (2d Cir. 2014) (summary order) (affirming conviction); *Mosquera-Prado* v. *United States*, No. 09 Cr. 723 (LAK), 2015 WL 13309469, at *1 (S.D.N.Y. Mar. 10, 2015) (denying motion filed pursuant to 28 U.S.C. § 2255).

> Nigerian individual by a woman traveling with El Negro.
> While drug transactions were occasionally discussed by
> Obiorah's contacts, and while he was aware of
> individuals who may have engaged in the drug trade,
> Obiorah never involved himself in any importation or
> distribution of narcotics to the United States prior to
> this indictment.

(*Id.* at 4-5).

Mr. Obiorah acknowledges that he ultimately conspired with El Sobrino to distribute heroin, and after two attempts — and the involvement of "Ayo" (an associate of Sobrino's, who was also a confidential informant) and "Estonement" (an associate of Mr. Obiorah's and a source of supply of heroin) — succeeded in obtaining one kilogram of heroin for Sobrino.  (Dkt. #19 at 5-6).  Of potential significance to this motion, Mr. Obiorah hastens to add that while he concededly discussed the sale of heroin with these and other individuals, he never discussed the United States as the destination of the drugs.  (*Id.*).  Mr. Obiorah also maintains that he "rebuffed" Sobrino's efforts to make him a full partner in the latter's narcotics business (*id.* at 7-9), and that he refused to agree to transactions involving drug quantities larger than one kilogram (*id.* at 9-10; *see also id.* at 10 ("The evidence demonstrates that, far from being an international drug kingpin, Obiorah was approached by a government informant who enlisted him to participate as an intermediary in a small, one-time drug transaction.")).

Mr. Obiorah recounts that he continued to discuss business transactions with El Sobrino in 2010 and 2011, and in furtherance of those discussions, traveled to the Dominican Republic in November 2010 and January 2011 to

meet with him.  (Dkt. #19 at 6-7).  However, Mr. Obiorah asseverates that these later business discussions did not include narcotics trafficking, but rather concerned potential joint ventures involving laptops and/or the oil and gas industry.  (*Id.*).[5]  According to Mr. Obiorah, he came to believe that El Sobrino may have been, or become, a government informant; indeed, he "believed that the government, through Sobrino, was hoping to make Obiorah another confidential source who could provide information regarding his drug contacts in Nigeria."  (*Id.* at 7).  Despite, or perhaps because of, these suspicions, Mr. Obiorah traveled to the Dominican Republic a third time, in June 2011, and on his return was arrested by agents from the Drug Enforcement Administration (the "DEA").  (*Id.*).

The Government presents a different view of events and, more particularly, of Mr. Obiorah's knowledge and intent:

> In the course of an investigation of large-scale international heroin trafficking, agents with the Drug Enforcement Administration (the "DEA") identified Obiorah as a heroin trafficker operating in Europe, Africa, and South America.  The DEA was able to introduce a confidential source ("CS-1") [El Sobrino/Young] to Obiorah for the purpose of arranging narcotics transactions.  In the fall of 2010, Obiorah planned and carried out a test delivery of one kilogram of heroin to an individual ("CS-2") [Ayo] in Lagos, Nigeria who claimed to be a drug associate of CS-1.  Later that year, Obiorah traveled to the Dominican Republic to meet with CS-1.  During those meetings, which were recorded, Obiorah discussed plans to ship large quantities of heroin to New York.  In one meeting,

---

[5]     Intercepted communications in which Mr. Obiorah was involved during this period make plain that this particular representation is false.

4

>Obiorah threatened to kill CS-1 if he turned out to be
>an informant.

(Dkt. #6 at 3-4).

According to contemporaneous DEA reports that were produced to Mr. Obiorah and his counsel in connection with trial, Mr. Obiorah (known by his alias, "Eddie Murphy") came to the attention of the DEA's Caribbean Division no later than August 2009.  (Dkt. #59-1 at 29 (DEA Form 6 Report dated August 4, 2009)).  The case initiation report detailed the Caribbean Division's understanding that Mr. Obiorah and an individual then known only as "Jose" were "smuggl[ing] multi-ton loads of cocaine from South America via West Africa to Europe, and [h]eroin to the United States." (*Id.*).  Subsequent reports of debriefing sessions with one or more confidential sources made clear that Mr. Obiorah "underst[ood] that the heroin is destined to traffickers based in New York." (*Id.* at 25 (DEA Form 6 Report dated April 30, 2010); *see also id.* at 37 (DEA Form 6 Report dated June 25, 2010 ("During prior conversations between the CS and [Mr. Obiorah, Mr. Obiorah] had offered to support heroin in Nigeria to the CS. ... [Mr. Obiorah] is under the assumption that the heroin will be transported from Nigeria to New York."); *id.* at 46-47 (DEA Form 6 Report dated September 16, 2010 (same)).

This Court's review of the evidence indicates that the Government's depiction of Mr. Obiorah has considerably more support.  Significantly, law enforcement recorded Mr. Obiorah repeatedly over a period of years, which recordings depict him as a knowing and intentional participant in narcotics transactions intended for the United States, and not some naïf who did not

5

appreciate his putative counterparty's numerous references to New York City. (*See, e.g.*, Dkt. #19-10 (transcript of telephone call of October 26, 2009, between El Sobrino and Mr. Obiorah discussing a meeting in Ghana, where Mr. Obiorah claimed to have "one of the best network[s]," in contemplation of a narcotics transaction; Mr. Obiorah notes as well that El Negro has "fucked up the whole of my network and I'm so sad"; Sobrino clarifies that his interest in working with Mr. Obiorah has "nothing got to do with Negro"); Dkt. #19-8 (April 2010 text messages between El Sobrino and Mr. Obiorah discussing the transportation to and receipt of drugs at "the towers," and the transportation of drugs "in africa to uncle sam"; Mr. Obiorah indicates that "if we do one and my friends see, then they can invest as much as u want");[6] Dkt. #19-6 (transcript of telephone call of July 5, 2010, between El Sobrino and Mr. Obiorah, in which Mr. Obiorah references discussions with one or more other people about the pricing of narcotics); Dkt. #19-4 (transcript of telephone call of July 16, 2010, between El Sobrino and Mr. Obiorah, discussing pricing for narcotics transaction and referencing "play[ing] baseball at Yankee Stadium"; Mr. Obiorah relates that he has "a lot of people that are interested to do something" on the order of "five" or "ten" if the "one" deal succeeds); Dkt. #19-5 (undated text exchange between El Sobrino and Mr. Obiorah, in which Sobrino refers to remitting to Mr. Obiorah "A PERCENTAGE ON WHATEVER I GET BACK IN RETURN ON THE MANHATTAN PRICE," and Mr. Obiorah announces his

---

[6]     Unless noted, the Court adopts the typing and grammatical conventions of the author of each communication.

"interest is for us to start something after that [in context, the contemplated one-kilogram transaction] there is many ways we can work"); Dkt. #19-7 (August and September 2010 emails between El Sobrino and Mr. Obiorah, including email in which Sobrino requests that the quality of the narcotics be good "so I don't have no trouble at the yankee stadium where I going to sell it"); Dkt. #19-9 (transcript of telephone call of September 7, 2010, between El Sobrino and Mr. Obiorah, where Sobrino announces that he has arrived in New York and is "sitting in Manhattan right now," and requests that Mr. Obiorah "go down here so we can start this"); Dkt. #45-2 (transcript of telephone call of September 16, 2010, between El Sobrino and Mr. Obiorah, where Sobrino notes that he is "still here in New York" and Mr. Obiorah states that he is trying to fly there by Wednesday of the following week); *see also* Dkt. #19-3 (transcript of telephone call of October 29, 2010, between El Sobrino and Mr. Obiorah discussing narcotics transaction using coded language); Dkt. #45-3 (transcript of recorded meeting of November 3, 2010, between El Sobrino and Mr. Obiorah in the Dominican Republic)).

## PROCEDURAL BACKGROUND

### A.    The Indictment and the Scheduling of Trial

The grand jury returned a sealed indictment (the "Indictment") against Mr. Obiorah on October 14, 2010, charging him in two counts with conspiracy to distribute and to possess with the intent to distribute one kilogram and more of heroin, in violation of 21 U.S.C. § 846; and conspiracy to import into the United States one kilogram and more of heroin, in violation of 21 U.S.C.

§ 963.  (Crim. Dkt. #2).  The Indictment was unsealed on June 23, 2011,
concurrent with Mr. Obiorah's arrest when his flight landed at John F.
Kennedy International Airport, and he was presented and arraigned before
Magistrate Judge James L. Cott on the following day.  (Crim. Dkt. #4; Minute
Entries for June 24, 2011).  Attorney Richard Jasper was appointed to
represent Mr. Obiorah under the Criminal Justice Act.  (Crim. Dkt. #7-8; *see
also* Dkt. #19-15 (excerpts from transcript of arraignment)).

At a pretrial conference held on August 9, 2011, the Honorable Harold
Baer, the District Judge to whom the case was originally assigned, set trial in
the matter down for November 28, 2011.  (Crim. Dkt. #10 (transcript of pretrial
conference of August 9, 2011); *see also* Minute Entries for August 9, 2011).
Thereafter, on September 22, 2011, Mr. Obiorah participated in a proffer
session with prosecutors and DEA agents to discuss "his knowledge of drug
trafficking and other criminal activities."  (App. Dkt. #23 at 14-16 (DEA Form 6
Report of proffer session)).  During the proffer, Mr. Obiorah recalled meeting
and discussing narcotics transactions with Emmanuel Atueyi, a Colombian
drug dealer, through whom Mr. Obiorah met El Negro.  (*Id.* at 14-15).  Mr.
Obiorah then recounted an unsuccessful transaction for one kilogram of
cocaine that he brokered between El Negro and a female drug dealer known as
"IK," which transaction culminated in the robbery of IK.  (*Id.* at 15).  Through
El Negro, Mr. Obiorah met El Sobrino, with whom he concluded a one-kilogram
heroin transaction in 2010, and the latter's colleague Ayo; Mr. Obiorah had
obtained the heroin in question from a dealer named "Esto[n]ement," after

failing to obtain it from another dealer named "Tony." (*Id.*).  Separately, Mr.
Obiorah recounted an unsuccessful 2008-2009 cocaine transaction with an
individual named "Carlos," and a successful 2008 cocaine transaction with an
individual named "Mario." (*Id.* at 15-16).

A few weeks before trial, at a pretrial conference held on November 1,
2011, Mr. Obiorah expressed disagreement with Mr. Jasper's trial strategy and
asked for a second attorney to be appointed to represent him.  (Dkt. #19-16
(transcript of pretrial conference of November 1, 2011)).[7]  Judge Baer agreed to
appoint new counsel, so long as incoming counsel would be available to try the
case at the end of the month, and Donald Yannella was ultimately appointed.
(*Id.* at 14; *see also* Crim. Dkt. #11, 13).

Shortly after his appointment, on November 7, 2011, Mr. Yannella
requested a forensic psychological examination of Mr. Obiorah in light of prior

---

[7]     Mr. Jasper agreed that a "new face" for trial would be appropriate, while commenting on
the surfeit of evidence inculpating Mr. Obiorah:

> Your Honor, I think that new counsel will be helpful because
> whether or not new counsel gives him the same advice as I have or
> not, hearing it a second time will be beneficial to Mr. Obiorah.  And
> he is looking at a mandatory minimum of ten years.  I have written
> him also a letter a couple of weeks ago which is in essence a defense
> version of a Pimentel letter so that he understands the
> consequences of going to trial and should he possibly be convicted.
> The evidence consists of e-mails, telephone recordings, chat rooms
> and a videotape which occurred in a hotel room I think in the
> Dominican Republic or Lagos, Nigeria....
>
> * * *
>
> But it's just not working with Mr. Obiorah.  There is just not
> sufficient trust, confidence.  *It's not that I am not getting answers
> that I want, I am not getting answers at all to certain questions.*  He
> needs a new face for his [defense].

(Dkt. #19-16 at 9-10 (emphasis added)).

counsel's concerns about Mr. Obiorah's "psychological and emotional well-being." (Dkt. #19-17 at 4 (excerpts from transcript of pretrial conference of November 7, 2011)).  Judge Baer agreed, and also adjourned the trial date to December 12, 2011.  (*Id.* at 2).  The following day, Judge Baer issued an order permitting defense expert Dr. Cheryl Paradis to conduct an examination of Mr. Obiorah at the Metropolitan Detention Center.  (Crim. Dkt. #12).

On December 1, 2011, Dr. Paradis advised the parties and the Court that Mr. Obiorah was competent to stand trial, and Judge Baer rejected the defense's request for an adjournment.  (*See* Crim. Dkt. #31 (transcript of pretrial conference of December 1, 2011)).  As the trial date approached, Mr. Yannella reported that his client's behavior had become more erratic, e.g., Mr. Obiorah was claiming to hear voices and threatening suicide; again, Mr. Yannella sought adjournment of the trial.  (*See* Crim. Dkt. #28 (transcript of pretrial conference of December 6, 2011)).  Initially, Judge Baer considered adjourning the trial to allow for a psychiatric evaluation of Mr. Obiorah.  (*Id.* at 7-8).  He changed his mind, however, upon hearing the opinions of Dr. Paradis that Mr. Obiorah's reported symptoms were inauthentic.  (*See, e.g.*, *id.* at 21 (Dr. Paradis: "Although he described symptoms that might indicate a psychosis, like hearing voices, the way he described it to me did not seem genuine."), 23 ("I think it could be a kind of a desperate attempt to deal with the stress of trial as opposed — not necessarily a well-thought-out strategy.")).[8]

---

[8]     The prosecutor declaimed Mr. Obiorah's antics as a ploy to avoid trial, and also previewed the evidence that would be introduced at the upcoming trial:

**B.     The Plea Allocation and the Motion to Withdraw**

On December 9, 2011, the Friday before his trial was set to begin, Mr. Obiorah entered a plea of guilty to Counts One and Two of the Indictment before Magistrate Judge Frank Maas, to whom the proceeding had been referred.  (Crim. Dkt. #27 (consent form to proceed before a magistrate judge); Crim. Dkt. #30 (transcript of plea proceeding)).  The Government had provided Mr. Yannella with a letter dated December 6, 2011, pursuant to *United States* v. *Pimentel*, 932 F.2d 1029 (2d Cir. 1991), which letter expressed the Government's then-current view that Mr. Obiorah's exposure under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") was 188 to 235 months' imprisonment, with a mandatory minimum term of 120 months' imprisonment.  (App. Dkt. #23 at 17-19).

 Judge Maas began by placing Mr. Obiorah under oath and confirming with Mr. Obiorah his desire to plead guilty to Counts One and Two, his competence to do so, and his satisfaction with the representation provided by

---

It seems clear to us that Mr. Obiorah doesn't like his options and is attempting to frustrate the trial date.  *A review of the recordings that have been produced and evidence the government intends to produce — intends to introduce at trial show Mr. Obiorah, during the months leading up to his arrest, being not just competent but an incredibly sophisticated and coherent businessman who's operating an international drug trafficking business literally on four separate continents, and there's no evidence whatsoever that he's somehow impaired psychologically or emotionally.*  So if he has come to some point in recent days where he's dismayed with his outcome, as your Honor said at the last conference, that's unsurprising and entirely normal, and there's no reason for us to believe that at some point in the future Mr. Obiorah is going to come to a point where he is pleased with the fact that he's facing trial for federal drug trafficking charges.

(Crim. Dkt. #28 at 6 (emphasis added)).

Mr. Yannella.  (Crim. Dkt. #30 at 2-5).  Judge Maas then reviewed each of the

counts and their associated penalties, while having the prosecutor recite the

elements of each count.  (*Id.* at 5-8).  With respect to the distribution

conspiracy charged in Count One, the prosecutor noted that

> the government would be required to prove with regard
> to Count One, first that there was in fact [a] conspiracy,
> that is an agreement or understanding to violate those
> provisions of law which make it illegal to distribute or
> possess with intent to distribute a controlled substance,
> here 1 kilogram and more of heroin.  Second, that the
> defendant knowingly and intentionally joined the
> conspiracy and participated in the conspiracy to
> distribute 1 kilogram and more of heroin.

(*Id.* at 7-8).  With respect to the importation conspiracy charged in Count Two,

the prosecutor noted that

> the government would be required to prove first that
> there was in fact a conspiracy, an agreement or
> understanding to violate those provisions of law which
> make it illegal to import a controlled substance into the
> United States or to manufacture or distribute a
> controlled substance with knowledge that the controlled
> substance would later be imported into the United
> States.  Specifically, again here 1 kilogram and more of
> heroin.  Second, that the defendant knowingly
> associated himself with the conspiracy and participated
> in the conspiracy to import a controlled substance or to
> distribute with knowledge that the controlled substance
> would be imported into the United States.

(*Id.* at 8).  Judge Maas specifically asked Mr. Obiorah if he understood that

those were the elements of the crimes to which he was pleading guilty, and he

answered in the affirmative.  (*Id.*).

After reviewing the rights that Mr. Obiorah would be waiving by pleading

guilty, Judge Maas asked him to explain in his own words, the conduct that

made him guilty of each offense.  (Crim. Dkt. #30 at 8-13).  Mr. Obiorah

allocuted as follows:

> Your Honor, Count One between 2007 and October 2010, I agreed with others to distribute 1 kilogram of heroin.  As part of the conspiracy on September 30th, 2010 I acted as a middleman.
>
> \*\*\*
>
> As part of the conspiracy on September 30th, 2010 I acted as a middleman in Lagos, Nigeria, with a man named Estonement [who] sold 1 kilogram of heroin to Ayo for approximately $24,000.  I was present for that transaction.  I brought Ayo because I knew Ayo wanted to buy 1 kilogram of heroin.  I knew that Ayo was going to send that heroin to New York.
>
> Count Two, between 2007 and October 2010 I agreed with others to import into New York 1 kilogram of heroin.  As part of that conspiracy on September 30th, 2010, I acted as a middleman with a man named Estonement to deliver 1 kilogram of heroin to Ayo.  I was present for that transaction.  I brought Ayo to Estonement because I knew Estonement could provide 1 kilogram of heroin.  I knew that Ayo was going to import that heroin into New York.  I knew it was illegal to import heroin into New York.

(*Id.* at 13-14).

As additional evidence of venue, the prosecutor proffered to Judge

Maas — without defense objection — that there was evidence of money

transfers to Mr. Obiorah from a confidential source in the Southern District of

New York, as well as phone calls made from this District, including calls where

13

"it was explained to [Mr. Obiorah] that the person was in New York in

Manhattan." (Crim. Dkt. #30 at 15-16).[9]  The prosecutor also related that

> The government would also introduce evidence in the
> form of conversations intercepted involving Mr.
> Obior[a]h where he spoke to the existence of
> coconspirators that he had in the New Jersey region and
> would establish that this was further evidence [that] the
> conspiracies reached into the Southern District of New
> York and New Jersey region.

(*Id.* at 15).  At the conclusion of the proceeding, Judge Maas recommended that

Judge Baer accept Mr. Obiorah's guilty plea.  (*Id.* at 17).[10]

## C.   The PSR and the *Fatico* Hearing

In connection with Mr. Obiorah's sentencing, the United States Probation

Office prepared a Presentence Investigation Report (the "PSR"), dated March 28,

2012.  In its description of the offense conduct, the Probation Office stated, in

relevant part:

> The DEA, through their investigation, has identified
> EDWIN CHIEDU OBIORAH as a sophisticated,
> international trafficker of hundreds of kilograms of
> heroin.  OBIORAH holds Nigerian and Venezuelan
> citizenship.  He also holds residency in Brazil.
> OBIORAH's worldwide travels include Europe.
> OBIORAH's criminal conduct in international heroin

---

[9]   Documentation of the money transfers was submitted to this Court in connection with the instant motion, accompanied by a written representation of the Government that

> if the matter had proceeded to trial, testimony would have revealed
> that these receipts demonstrate that money was sent from a
> confidential source to [Mr. Obiorah], that this money originated in
> New York, New York, and that [Mr. Obiorah] would have had to
> have known that this money had come from New York, New York,
> in order to have picked it up, which he ultimately did.

(Dkt. #29).

[10]   Judge Baer ultimately accepted the plea on June 14, 2012.  (Crim. Dkt. #34).

trafficking spans from at least 2007 up to his instant arrest in New York City on June 24, 2011.

On September 28, 2010, in Lagos, Nigeria, OBIORAH discussed a plan to traffic large quantities of heroin into New York. At around the same time period, OBIORAH sold one kilogram of heroin to a DEA informant in Nigeria.

OBIORAH traveled to the Dominican Republic in late 2010 to effectuate his plan to traffic heroin into New York. During at least two meetings while OBIORAH was in that country, he met with an individual who was in fact an informant with Dominican law enforcement. During one of these meetings, either in November 2010 or January 201[1], OBIORAH told the informant that if he/she was in fact an informant, that he (OBIORAH) would kill him/her.

***

The DEA's investigation reveals that OBIORAH had planned to traffic as much as 150 kilograms, and possibly more, of heroin into New York.

(PSR ¶¶ 9-11, 13; *see also id.* at nn.1-3 (noting that Mr. Obiorah disclaimed the threat of violence, the destination of his flight from the Dominican Republic, and the quantity of heroin attributable to him)).

The Guidelines analysis conducted by the Probation Office also differed in several respects from the Government's *Pimentel* letter. While the Probation Office agreed with the Government that the base offense level under U.S.S.G. § 2D1.1 was 38 and the Criminal History Category was I, it also found a two-level enhancement based on Mr. Obiorah's threatened use of violence against a confidential source, and a resulting Guidelines range of 235 to 293 months' imprisonment. (PSR ¶¶ 19, 20, 28, 31, 50).

15

Approximately five months after his guilty plea, in an email to Mr. Yannella dated May 14, 2012, Mr. Obiorah expressed concerns about the validity of his plea.  (Dkt. #19-20).  In particular, and in contravention of his statements to Judge Maas, Mr. Obiorah stated that he was *not* in fact "involved to send this heroin to new york," and asked rhetorically whom he could "conspire with to send this heroin to new york."  (*Id.*).  For reasons explained later during an evidentiary hearing on the instant motion, defense counsel did not immediately raise this issue with Judge Baer or the Government.

Instead, the parties proceeded to a hearing on June 14, 2012, pursuant to *United States* v. *Fatico*, 603 F.2d 1053 (2d Cir. 1979), to address the defense's disputes regarding: (i) the quantity of heroin involved; (ii) purported threats of violence made by Mr. Obiorah to El Sobrino; and (iii) the consequent potential for his disqualification from safety-valve relief pursuant to 18 U.S.C. § 3553(f).  (*See* Crim. Dkt. #32 (letter from defense counsel discussing potential need for hearing); Crim. Dkt. #37-2 (declaration from Mr. Obiorah); Crim. Dkt. #38 (transcript of pre-sentencing conference of June 14, 2012)).  During the *Fatico* hearing, Judge Baer first heard oral argument from counsel for each side regarding the appropriate drug quantity and the *bona fides* of the threat of violence, before hearing from Mr. Obiorah.  (Crim. Dkt. #38 at 7-15).

Mr. Obiorah began by discussing his life and work in Nigeria, as well as his involvement with the other individuals implicated in the Government's investigation.  (Crim. Dkt. #38 at 16-35 (direct examination), 35-63 (cross-examination)).  On direct examination, Mr. Obiorah testified in relevant part

16

that: (i) he did not believe that El Sobrino was serious about the heroin transaction until the latter paid Mr. Obiorah's ticket fare to Nigeria to source one kilogram of heroin (*id.* at 20); (ii) he attached no significance to Sobrino's frequent references to New York City landmarks (*id.* at 22-23); (iii) his efforts to source heroin in Nigeria were conducted with no secrecy (*id.* at 24); (iv) over time, he began to suspect that Sobrino was working for the Government (*id.* at 30); (v) at no time did he threaten Sobrino (*id.* at 31); (vi) he had no access to 50-kilogram quantities of heroin (*id.* at 33); and (vii) he lied to Sobrino about his wealth and his visits to the United States "to boost [his] ego" (*id.* at 34, 35).

On cross-examination, Mr. Obiorah acknowledged having had multiple discussions with El Sobrino about "moving 50 kilograms of heroin." (*See* Crim. Dkt. #38 at 38-40, 46).[11] He was also shown a transcript of a recorded conversation in which he advised El Sobrino of his desire to assault another man as a result of a failed drug transaction. (*Id.* at 51; *see also* App. Dkt. #23 at 140-42 (declaration of Alexander Young, a/k/a "El Sobrino," regarding discussions with Mr. Obiorah about 50-kilogram heroin transactions and threats of violence); Crim. Dkt. #35 (Government sentencing submission, including transcripts of intercepted communications with Mr. Obiorah

---

[11]   The Government introduced transcripts of several of those intercepted communications during the *Fatico* hearing. (*See, e.g.*, Crim. Dkt. #38 at 63). In a lengthy recorded meeting between Mr. Obiorah and El Sobrino that took place in the Dominican Republic on November 3, 2010, the parties repeatedly and extensively discussed co-conspirators of Mr. Obiorah who were located in New Jersey. (*See* Dkt. #45-3 at 2, 13, 24). Additionally, Mr. Obiorah discussed working with co-conspirators to smuggle narcotics from Pakistan to the Dominican Republic or even for the narcotics "to come to New York, to the U.S., if you want," by way of Canada. (*Id.* at 7).

regarding a contemplated 50-kilogram transaction and purported threats of violence)).  The prosecutor also questioned Mr. Obiorah about the detailed knowledge of the logistics of transporting drugs that he evidenced in the recorded conversations, as well as his involvement with a drug dealer named "Emanuel," all in an effort to demonstrate that Mr. Obiorah was more sophisticated, and more involved in drug trafficking, than he had let on.  (Crim. Dkt. #38 at 52-60).

At the conclusion of the *Fatico* hearing, Judge Baer requested supplemental written submissions from the parties and reset the sentencing date for August 2, 2012.  (Crim. Dkt. #38 at 64-65; *see also* App. Dkt. #23 at 148-68 (transcript of pre-sentencing conference of August 2, 2012)).  At the August 2 hearing, Judge Baer began by advising the parties of his need for still more information from the parties regarding several issues before he could proceed with sentencing.  In Judge Baer's estimation, there was "sufficient evasiveness" in Mr. Obiorah's testimony that the Court could conclude that he did not qualify for safety-valve relief.  (App. Dkt. #23 at 144).[12]  Judge Baer was also "perfectly clear about the one kilo of heroin that [Mr. Obiorah] pled to." (*Id.*).  However, the Court was less certain about, and heard extensive oral argument from the parties concerning, the purported threats of violence (*id.* at 145-56), and the additional quantities of heroin the Government sought to

---

[12]     *See* 18 U.S.C. § 3553(f) (requiring, as the fifth condition of safety-valve relief, that "not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan").

attribute to Mr. Obiorah (*id.* at 156-67).  At the conclusion of the proceeding,
Judge Baer rescheduled the sentencing for August 16, 2012.

## D.     **The Motion to Withdraw the Guilty Plea and the Sentencing**

On or about August 16, 2012, Mr. Yannella filed a motion on Mr.
Obiorah's behalf to withdraw his guilty plea.  (Crim. Dkt. #40; *see also* App.
Dkt. #23 at 172-206 (transcript of sentencing proceeding of August 16, 2012,
with references to Mr. Yannella's motion having been submitted at 10:41 p.m.
the previous evening)).  The motion was accompanied by a declaration from Mr.
Obiorah in which he stated that he had no agreement, other than with a
confidential informant, to violate the laws of the United States or to send
heroin to New York.  (Crim. Dkt. #40).

The motion was addressed by Judge Baer at the sentencing proceeding
held later that day.  (App. Dkt. #23 at 172-206).  Mr. Yannella argued for the
first time that his client's guilty plea had been factually insufficient because
Mr. Obiorah had not specifically admitted in his allocution that he had
conspired with someone other than a government actor to violate the narcotics
laws.  (*Id.* at 176-77).[13]  The prosecutor objected to the eleventh-hour motion,
and cited the amount of time that had lapsed since Mr. Obiorah's plea, the
prejudice to the Government that would inhere in granting the motion, Mr.
Obiorah's prior episodes of malingering in the case, and the legal sufficiency of

---

[13]     Notably, however, Mr. Yannella requested in the first instance opportunities to brief the
issue further and to speak with his client, expressly acknowledging the pitfalls to Mr.
Obiorah if he were to proceed to trial and the jury were to hear conversations about 50-
kilogram transactions and threats of violence in which Mr. Obiorah was involved.  (*See,
e.g.*, App. Dkt. #23 at 175-76, 185-86).

his guilty plea. (*Id.* at 177-180; *see also id.* at 180 (noting that Mr. Obiorah had allocuted to having an agreement with a person other than the confidential informant, and summarizing the factual proffer that had been made by the prosecutor without defense objection during the plea allocution)).

Judge Baer first considered allowing the defense to make a supplemental submission "to make sure we have some New York connection"; in other words, the Court did not doubt that the allocution satisfied the elements of the offense and the jurisdictional requirement, but rather focused on the issue of venue. (App. Dkt. #23 at 184).[14]  However, when reminded by the prosecution that the issue at hand was "whether what [Mr. Obiorah] said at his plea allocution is sufficient for us to conclude that there is a factual predicate for us to believe that he actually committed … the two crimes in the indictment" (*id.*), Judge Baer reversed course, and found that there was a way to satisfy his concerns on the record before him (*id.* at 185).  Ultimately, he denied the motions to adjourn and to withdraw the plea, concluding that the record reflected ample information for him to make "a relatively clear decision that in fact there really is no reason to suspect that [Mr. Obiorah] didn't import these drugs or plan to into the United States, whether it is New York or New Jersey, and that he didn't do it in concert with at least one other culpable conspirator." (*Id.* at 187; *see also* Crim. Dkt. #41 (order denying motion to withdraw)).

---

[14]     On this point, the prosecutor reminded Judge Baer that, during Mr. Obiorah's plea allocution, the Government had proffered evidence of intercepted communications in which Mr. Obiorah and El Sobrino discussed additional, non-government-actor co-conspirators in New Jersey.  (App. Dkt. #23 at 181-82).

After hearing from the parties concerning the various sentencing disputes, Judge Baer imposed sentence. (App. Dkt. #23 at 196-206). He confirmed his earlier decision "that the safety-valve is unusable for this defendant for more than one reason, but certainly with respect to the fifth item." (*Id.* at 196). As to the enhancement for a credible threat of violence, Judge Baer found "too little" in the record on which he could rely (*id.*), noting that he had not had an opportunity to observe El Sobrino testify in person, and that he was not fully persuaded by the declaration and the recorded communications, particularly given the defense's focus on "cultural differences" (including, in particular, the degree to which falsity in business dealings was an accepted practice in Mr. Obiorah's culture) (*id.* at 197). On the issue of quantity, Judge Baer was similarly equivocal: While crediting certain of the Government's evidence, Judge Baer expressed concern with the Government's substantiation for the 50-kilogram transaction. (*Id.* at 201-02). More than this, Judge Baer believed that a careful review of the factors set forth in 18 U.S.C. § 3553(a) required a lower sentence than that recommended by the Probation Office for a Guidelines range based on a drug quantity in excess of 30 kilograms of heroin. (*Id.* at 198-200). Accordingly, Judge Baer sentenced Mr. Obiorah principally to concurrent terms of 120 months' imprisonment, the statutory mandatory minimum. (*Id.* at 202-03; *see also* Crim. Dkt. #42 (judgment)).

21

E.    **The Appeal**

Mr. Obiorah appealed from his conviction and sentence, and was represented by new counsel, Robert J. Boyle, on appeal.  (*See generally* App. Dkt.).  On appeal, Mr. Obiorah raised two issues:  *First*, he argued that Judge Baer had abused his discretion in denying the motion to withdraw the guilty plea, arguing that (i) there was an insufficient basis to conclude that Mr. Obiorah had understood the nature of the charges against him — in particular, the fact that both conspiracies required proof that Mr. Obiorah had conspired with someone who was not a government agent — and (ii) there was an insufficient factual basis for the plea, again because of the absence of proof of non-government-actor co-conspirators.  (App. Dkt. #22 at 29-42 (citing Fed. R. Crim. P. 11(b)(1), (3))).  *Second*, Mr. Obiorah argued that Judge Baer had erred in denying him safety-valve relief without providing a sufficient factual basis. (*Id.* at 42-54).  In opposition, the Government amplified the arguments it had made at sentencing, noting (i) the passage of time between plea and motion; (ii) the inadequacy of Mr. Obiorah's claims of error during the plea proceeding; (iii) the prejudice to the Government if the motion had been granted; and (iv) the sufficiency of the record to deny safety-valve relief.  (App. Dkt. #41 at 21-41).

The Second Circuit affirmed Mr. Obiorah's conviction and sentence in a summary order dated September 5, 2013.  *See United States* v. *Obiorah*, 536 F. App'x 53 (2d Cir. 2013) (summary order).  Addressing first the motion to withdraw, the Court of Appeals found no abuse of discretion in Judge Baer's

decision.  *Id.* at 55.  It found that Mr. Obiorah's decision to wait eight months before filing the motion, standing by itself, "weigh[ed] against granting [the] motion," and that permitting withdrawal of the plea after such a delay almost certainly would have prejudiced the Government.  *Id.*[15]  Turning next to the defense's legal arguments concerning the validity of the plea, the Second Circuit summarily rejected them.  It found that Mr. Obiorah's plea allocution, plus the uncontested factual proffer made by the prosecution regarding recordings that referenced additional co-conspirators in New Jersey, "provided an adequate factual basis from which the district court could assure itself that Obiorah had entered into a conspiratorial agreement with one or more persons who were not government agents."  *Id.* at 56 (collecting cases).  And in response to Mr. Obiorah's arguments requiring specific intent, the Court found that his protestations about the knowledge of co-conspirator Estonement "hardly foreclose[d] Estonement's knowledge and intent."  *Id.*  In any event, the Government's proffers regarding evidence about the New Jersey conspirators "[were] sufficient assurance of an agreement between Obiorah and one or more other persons for heroin to reach the United States."  *Id.*

---

[15]     Indeed, the Second Circuit did not fault Mr. Yannella for his delay in bringing Mr. Obiorah's request to the attention of Judge Baer:

> Although defense counsel told the district court that he did not immediately act upon Obiorah's request to withdraw, the record indicates that any delay due to counsel's inaction was minimal, *see* Tr. 3:14-19, J.A. 171 (stating that Obiorah asked defense counsel to file motions as his sentencing date "approach[ed]"), and therefore cannot excuse the significant lapse in time between Obiorah's plea and motion.

*United States* v. *Obiorah*, 536 F. App'x 53, 55 (2d Cir. 2013) (summary order).

23

On the issue of notice of the charges against him, the Second Circuit again made short work of Mr. Obiorah's arguments.  It found, first, that the inquiry by Judge Maas was sufficient under Rule 11.  536 F. App'x at 56-57 (collecting cases).  More to the point, the Court found that

> [i]nsofar as Obiorah faults the district court for failing specifically to advise him that a conspiracy requires an agreement with at least one individual who is not a government agent, the point merits little discussion because any error would necessarily be harmless in light of our earlier discussion of Obiorah's statements regarding Estonement's role in the conspiracy and the government's proffered evidence showing that he entered into such an agreement.

*Id.* at 57.

The Second Circuit also upheld Judge Baer's decision not to award safety-valve relief to Mr. Obiorah.  536 F. App'x at 57-58.  In particular, it credited the District Court's conclusion of "sufficient evasiveness" in Mr. Obiorah's *Fatico* hearing testimony regarding his involvement in the charged conspiracy as "find[ing] support in material inconsistencies between Obiorah's hearing testimony and recorded statements to the confidential informant."  *Id.* at 58.  Finally, as to Mr. Obiorah's remaining arguments on appeal, the Court of Appeals "conclude[d] that they are without merit," and affirmed the judgment.  *Id.*

## F.    The Instant Section 2255 Motion

One month after the Second Circuit's summary affirmance, on October 9, 2013, Mr. Obiorah filed an uncounseled motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255.  (Dkt. #1).  Included with his motion was

a declaration from Mr. Obiorah that included both factual and legal assertions; the former category included statements that (i) he had rejected El Sobrino's offer to export heroin from Nigeria and had no culpable co-conspirators in the United States; (ii) he did not understand the conspiracy charge to which he pleaded guilty; (iii) Mr. Yannella had failed to explain to him that he could not be convicted of conspiracy if his only co-conspirator was a government agent; and (iv) the indictment to which he pleaded guilty did not charge the September 2010 heroin transaction that was discussed at his sentencing.

After Judge Baer entered an Order to Answer to schedule a response from the Government (Dkt. #3), Mr. Obiorah filed a letter inquiring about the appointment of defense counsel (Dkt. #5; *see also* Dkt. #7 (application for the appointment of counsel)).  Judge Baer issued an order requesting that the Pro Se Litigation Unit find counsel to represent Mr. Obiorah in this matter, though he acknowledged that there was no guarantee that counsel would be located. (Dkt. #9).

After Judge Baer's passing, the case was reassigned to the undersigned. (*See* Dkt. #18).  At or about the same time, counsel from the Kirkland & Ellis firm entered an appearance (Dkt. #15-16), and requested an opportunity to amend (Dkt. #17; *see also* Dkt. #18 (order granting request)).  Counsel for Mr. Obiorah filed an amended Section 2255 motion on September 29, 2014 (Dkt. #19-20); the Government filed its initial opposition on November 10, 2014 (Dkt. #21); and counsel for Mr. Obiorah filed his reply submission on November 24, 2014 (Dkt. #22).

At its core, the amended Section 2255 motion claims ineffective assistance of counsel on the part of Mr. Yannella in connection with Mr. Obiorah's guilty plea.  (Dkt. #20).  In brief, Mr. Obiorah contends that his prior counsel failed to advise him of the charges against him and, in particular, the requirement that Mr. Obiorah must have agreed with at least one person who was not a government agent in order to achieve the specific goal prohibited by the statute, e.g., the intent to import drugs into the United States.  (*Id.* at 9 (collecting cases); *see also id.* at 10 ("Here, even if Obiorah was aware that Sobrino intended to import drugs to the United States — which Obiorah disputes — there was no evidence that Obiorah and Estonement — the only non-informant with whom Obiorah dealt during the transaction — ever agreed to send drugs to the United States."); *id.* ("Had Obiorah known that the government had to prove specific intent to support a conviction, he would have shown at trial that he did not understand these offhand remarks [regarding the United States and New York City landmarks] because of his unfamiliarity with the United States, as he maintained at his sentencing hearing.")).  Separately, Mr. Obiorah alleges that Mr. Yannella was ineffective in failing to investigate and to advise him of all available defenses, including the defenses of lack of jurisdiction and entrapment.  (*Id.* at 12-17).

The Court held an initial conference on Mr. Obiorah's motion on May 16, 2016, at which it discussed the manner in which the motion was to be resolved and certain factual proffers made by the Government.  (Dkt. #24 (order scheduling conference); Dkt. #25 (transcript of conference of May 16, 2016)).

26

More colloquially, the Court inquired about "what's being argued and what's being responded.  And from there that I can determine what documents I ought to have." (Dkt. #25 at 3).  The Court first addressed these issues with Mr. Obiorah's counsel, who confirmed that certain of the arguments made in Mr. Obiorah's original motion were in fact foreclosed by the appeal, and that although they were continuing to rely on Mr. Obiorah's declaration for the underlying facts, the focus of the arguments had shifted to "ineffective assistance of counsel on withdrawal of the plea agreement." (*Id.* at 5).  In this regard, the Court discussed issues with counsel that it understood to be the subject of dispute, including the legal effect of the Second Circuit's order, the substantiation for the Government's references to conspirators in New Jersey, the timeliness of the motion to withdraw, the evidence of knowledge of the destination of the heroin, and the issue of entrapment. (*Id.* at 7-18, 21-25). The Court also discussed with counsel the appropriate scope of the waiver of Mr. Obiorah's attorney-client privilege with Mr. Yannella. (*Id.* at 18-20, 23-27). With the Government, the Court discussed issues involving the knowledge and location of the co-conspirators, but focused principally on the record evidence to support or refute Mr. Obiorah's claims of entrapment. (*Id.* at 27-35).

At the conclusion of the hearing, the Court scheduled supplemental briefing on the issues of "the scope of the waiver, if any, additional materials you think I ought to have, and the materials that I have been discussing with you.  And when I talk about additional materials that you think I ought to have, that includes Mr. Yannella, some sort of statement from him." (Dkt. #25

27

at 38).  The Government submitted a letter, in which defense counsel joined in relevant part, on June 24, 2016.  (Dkt. #29).  In the letter, the parties agreed "that a potential waiver of the attorney-client privilege may arise with regard to the content of discussions relevant to the ineffective assistance claims raised in the" motion, and discussed the scope of that waiver.  (*Id.* at 1-2 (collecting cases)).[16]

## G.     The Evidentiary Hearing on Mr. Obiorah's Section 2255 Motion

The Court then scheduled a hearing at which both Mr. Obiorah and Mr. Yannella would testify; the hearing was ultimately held on July 11, 2018.  (Dkt. #30, 37 (scheduling orders); *see also* Dkt. #39 (transcript of evidentiary hearing of July 11, 2018)).  On direct examination, Mr. Obiorah began by emphasizing the facts that he was born and educated in Nigeria; that he worked in the import-export business and had no legal training; and that he had never been to the United States before his arrest.  (Dkt. #39 at 4-6).  He also suggested that his relationship with attorney Yannella began on the wrong foot, inasmuch as his "mental situation was really very bad" and Mr. Yannella believed from the start that Mr. Obiorah "w[ould] be convicted if [he] went to trial."  (*Id.* at 6-8).  In his testimony, Mr. Obiorah repeatedly sought to contrast his dependence on Mr. Yannella for legal advice with the dearth of advice that he actually received.  (*See, e.g.*, *id.* at 9 (indicating that Mr. Yannella had advised him that he was guilty of conspiracy for agreeing with a confidential informant), 9-11

---

[16]     Mr. Obiorah subsequently filed a written waiver of the attorney-client privilege.  (Dkt. #38).

(indicating that he could not recall Mr. Yannella discussing the intended destination of the drugs), 10 ("I cannot recall Yannella discussing any defense at all to the case."), 12 ("I don't believe we discussed this concept of jurisdiction."), 12 ("No, he did not discuss the concept of entrapment with me. … I don't believe that Mr. Yannella … ever actually sat me down and told me that he has made a proper research as to my crime or the charges against me and that he has actually found out that there is evidences or that there is a kind of defense against my charge.")).  Despite this purported lack of guidance, Mr. Obiorah claimed to have pleaded guilty because Mr. Yannella advised him to do so; he simultaneously claimed, however, to have had no involvement in the preparation of his allocution, and only a modest contemporaneous understanding of the law.  (*Id.* at 12-15).

According to Mr. Obiorah, several post-plea developments caused him to reconsider his decision to plead guilty, including improvements to his emotional state and legal discussions with fellow detainees.  (Dkt. #39 at 15-16).  From these discussions, Mr. Obiorah "discovered that [he] cannot be properly convicted by conspiring with a confidential informant under the United States law." (*Id.* at 16).[17]  Though Mr. Obiorah emailed Mr. Yannella to discuss these concerns, he claimed that they did not discuss withdrawal of the plea until just before sentencing.  (*Id.* at 17-18).

---

[17]    Counsel for Mr. Obiorah also directed him to passages in his May 14, 2012 email that appeared to suggest concerns regarding the specific intent to send the narcotics to New York.  (Dkt. #39 at 21-22).

On cross-examination, counsel for the Government reviewed with Mr. Obiorah various statements he had made under oath at his plea proceeding and several he had *not* made, i.e., any expressions of concern regarding his competence to plead guilty or his satisfaction with his counsel. (Dkt. #39 at 23-24). The prosecutor then addressed information provided by Mr. Obiorah during a proffer session with law enforcement shortly after his arrest, in which Mr. Obiorah had detailed certain facts about his "history of drug dealing," including his interactions with several drug traffickers. (*Id.* at 25-27 (referencing transactions and contemplated transactions with drug traffickers Emanuel Atueyi, IK, El Negro, and Carlos)).

The Court then heard from Mr. Yannella, who began by summarizing his nearly 30 years of experience as a criminal defense attorney, including his representations of numerous individuals charged with narcotics trafficking and/or importation conspiracies. (Dkt. #39 at 31-33). Mr. Yannella recalled being substituted in as counsel for Mr. Obiorah shortly before trial, and reviewing the evidence provided to him by prior counsel Richard Jasper, which evidence included video and audio recordings of Mr. Obiorah engaged in conversations about narcotics trafficking. Mr. Yannella also learned about statements Mr. Obiorah had made to law enforcement during his September 2011 proffer session, which information caused Mr. Yannella to consider and work towards the possibility of Mr. Obiorah entering into a cooperation agreement with the Government. (*Id.* at 37, 40-41).

As the trial date approached, Mr. Obiorah began to express "issues regarding anxiety and psychological disturbance." (Dkt. #39 at 34).  In consequence, Mr. Yannella obtained permission from Judge Baer to retain Dr. Paradis, who he recalled initially found Mr. Obiorah fit to proceed, if suffering from anxiety, and later found that Mr. Obiorah was "malingering."  (*Id.* at 34-35).

Mr. Yannella testified about Mr. Obiorah's guilty plea, including discussions prior to the plea and Mr. Obiorah's substantial involvement in preparing his allocution.  (Dkt. #39 at 36).  He acknowledged that after the plea proceeding, Mr. Obiorah sought to withdraw his guilty plea on several occasions, but also stated that he had been able to convince Mr. Obiorah of the inadvisability of such a course of action.  (*Id.* at 39-40; *see also id.* at 57 (discussing a visit to Mr. Obiorah in prison after receiving the May 14, 2012 email, during which Mr. Yannella "went through all the calls with [Mr. Obiorah] again and all the instances where [Mr. Obiorah] had said in many different ways that his people could move drugs to Canada to get into the U.S., get a boat, get a plane")).

Part of the difficulty faced by Mr. Yannella was that Mr. Obiorah would tell him different, mutually contradictory versions of the underlying events. For example, while Mr. Yannella sought to propound sentencing arguments centered on "cultural differences," including the ostensible acceptance in Nigeria of false statements in business dealings, he recalled that "[t]here were times when [Mr. Obiorah] was adamant about that, but there were times where

he really would step back from that and tell us about who he was and what his history was." (Dkt. #39 at 42). In particular, Mr. Obiorah "was admitting that he was involved in narcotics trafficking, but he was saying that in this case [he] really didn't have the opportunity to get 50 kilos, and nobody would go from 1 kilo [i.e., the September 2010 transaction] to 50 kilos." (*Id.* at 42-43).

Relations between client and counsel changed on the eve of Mr. Obiorah's sentencing, as Mr. Yannella recounted:

> I had visited him the night before in the jail or maybe two nights before, I can't remember, but I was surprised to find that he adamantly wanted to withdraw his guilty plea. He had a case, *United States* v. *Hendrickson*, [26 F.3d 321 (2d Cir. 1994),][18] which on its face had a lot of similarities to our case, but when you listen to the recordings in this case, my conclusion was that the government's case was very strong against my client. So although there were facial similarities, there were real differences when you get down to the facts of the case.
>
> Then I tried to tell him why that was such a bad idea, and those reasons were that we were trying to persuade the judge to give him at least the mandatory minimum sentence. I think the judge had indicated previously he wasn't inclined to grant safety valve. The judge hadn't ruled on the threat issue, I don't believe. There's a two-point enhancement for the threat. We had already lost one point for acceptance of responsibility because he didn't plead until just before the trial began, and I thought we would lose two more. *The statements that*

---

[18]    The *Hendrickson* case involved a sentencing challenge to the quantity of narcotics the defendant intended to import from Nigeria into the United States. *United States* v. *Hendrickson*, 26 F.3d 321, 330 (2d Cir. 1994). Using the version of the Guidelines then in effect, the Second Circuit found that with respect to contemplated, but not completed, transactions that the defendant had personally negotiated, the Government bore the burden of proving that the defendant actually intended to produce the amount at issue. *See id.* at 332 ("In such cases, the defendant's 'ability' and that of his co-conspirators to produce a particular amount play an important, though not dispositive, role in establishing the defendant's intent to produce this amount, and thereby, the conspiratorial agreement as to such amount.").

> *he was making to me didn't seem to match what I heard
> from the discovery.*

(*Id.* at 38-39 (emphasis added)).  Mr. Yannella did not believe the *Hendrickson*

case to be dispositive, inasmuch as it dealt with sentencing and not

substantive conspiracy law, but he was unable to dissuade his client:

> I just knew I couldn't reason with him.  I couldn't
> persuade him.  I couldn't talk sense to him.  I couldn't
> start going back through all the recordings where he
> talks about my people want to meet you, too, or my
> people want to see you do a transaction before we do it,
> times where he'd mentioned other people.  There were
> other people involved, Tony, Emmanuel, I think a
> reference to his brother or a cousin.  I'm not sure if they
> really were a brother or a cousin.  I didn't have time to
> go back into all of that.  We were on the verge of
> sentencing.

(*Id.* at 44).

As noted, Mr. Yannella first sought to obtain more time, in order to

convince Mr. Obiorah not to withdraw his guilty plea, but when Judge Baer

denied the request, he made the motion to withdraw, seizing upon an

ambiguous statement that Mr. Obiorah had added to his allocution regarding

"Ayo," an individual known to be a confidential informant.  (Dkt. #39 at 45-46,

50-51).  At the time, Mr. Yannella expressed a concern to Judge Baer that his

client's plea might have been insufficient; however, during the hearing before

this Court, he clarified that Mr. Obiorah's statement had in fact been a

sufficient allocution to the charged conduct, but that his inclusion of a

confidential informant had muddied the waters.  (*Id.* at 50).[19]

---

[19]     Indeed, in response to questioning from the Court, Mr. Yannella explained his rationale
         further:

Counsel for Mr. Obiorah focused his cross-examination of Mr. Yannella on the lawyer's and client's respective knowledge of federal criminal law. (Dkt. #39 at 45-47). When asked specific questions about contemporaneous research he did into conspiracy law, Mr. Yannella responded that he knew from his decades of experience as a criminal defense attorney that an individual could not conspire with a government agent. (*Id.* at 47). Similarly, Mr. Yannella did not specifically research the issue of the requisite intent for the importation and distribution offenses because he knew it from other cases. (*Id.* at 51-52). And on the issues of jurisdiction and entrapment, Mr. Yannella conducted no contemporaneous research, because he understood the law of each, and had concluded both that the Government had "clear jurisdiction" and that there had been no entrapment. (*Id.* at 51-53). But as to other areas, including legal issues implicated by the motion to withdraw, Mr. Yannella conducted additional research. (*Id.* at 58).

From there, counsel for Mr. Obiorah inquired about whether Mr. Yannella believed at the time that the Government could prove that Mr.

---

Q. Is it fair to say that — well, is it fair to say that you saw the inclusion of Ayo's name as a hook or a means to allow you to implement your client's desire to move to withdraw the plea?

A. Yes. And he wanted to play that card. He was adamant about it, and I thought I had to play it at that point. Actually, I was really hoping to be able to talk to him some more, the way we talked previously, so I could remind him that we were about to go into a sentencing proceeding where the guidelines were sky high, and I was trying to get him — I didn't think — safety valve wasn't in play at that point. I was still arguing for it, but at least the mandatory minimum.

(Dkt. #39 at 66).

Obiorah conspired with a non-government actor.  Mr. Yannella responded in

the affirmative, but in so doing explained why his client's wavering fidelity to

the facts of the case complicated his ability to represent Mr. Obiorah effectively:

> Q. Did you advise Mr. Obiorah that the government would be able to prove that he had conspired with a coconspirator?
>
> A. Yes.
>
> Q. Who did you tell Mr. Obiorah was the coconspirator?
>
> A. Well, I never did tell him who I thought it was.  I think that was one of the big problems in dealing with Mr. Obiorah.  I couldn't get information — I had difficulty getting information out of him that was accurate.  So it wasn't for me to tell him who the coconspirators were. There were a number of possibilities: Emmanuel, Tony, Estonement, somebody they called "Old Man," someone named "Mr. Sunday."  But he wasn't going to tell me who — he wasn't the type of defendant to tell me what roles different people played.
>
> &ast;&ast;&ast;
>
> [THE COURT:] Did you come to understand the roles, if any, that each of the individuals you just mentioned played in the events that brought Mr. Obiorah to prosecution here?
>
> THE WITNESS: Yes.
>
> THE COURT: Did you have an understanding that any of these individuals — Emmanuel, Tony, Estonement, the Old Man, I'm sure I'm forgetting others — were any of those individuals confidential informants or otherwise related to law enforcement?
>
> THE WITNESS: The only two who were confidential informants that I know of were Ayo and Sobrino.
>
> THE COURT: So that's no to my question?
>
> THE WITNESS: Yes.

35

> THE COURT: Did you understand these individuals to be coconspirators?
>
> THE WITNESS: Based upon what I saw in the evidence, from listening to the recorded conversations, I knew they were involved in the transaction involving 1 kilogram of heroin.  Whether or not they were part of the conspiracy to import heroin into the United States really, in my opinion, came more from Mr. Obiorah's own words in a whole series of phone conversations.  So it was Mr. Obiorah saying:  My people are skeptical of you; I need to be there; they don't want to deal with you.
>
> THE COURT: I see.  And you believed "my people," and I'm putting quotes around that term, included one more of these individuals?
>
> THE WITNESS: Yes, but I didn't know who exactly.

(Dkt. #39 at 53-54).  Mr. Yannella acknowledged the lack of "hard documentary evidence" that any of the putative co-conspirators intended for the narcotics to "end up in the United States," but, in light of their attorney-client discussions, he made sure that Mr. Obiorah understood prior to his plea that "he could only be guilty of this conspiracy charge if his coconspirators intended to import drugs into the United States."  (*Id.* at 54-55).

After the parties finished their examinations of Mr. Yannella, the Court asked a few clarifying questions, in light of its absence from certain prior proceedings described by the two witnesses.  (Dkt. #39 at 59).  To begin, the Court inquired about Mr. Obiorah's mental and emotional health; Mr. Yannella noted that his client suffered from anxiety, but that Mr. Obiorah was able to understand what counsel was saying and to communicate to counsel the facts of the case.  (*Id.* at 59-60).  However, a follow-up question about whether Mr. Obiorah communicated to Mr. Yannella the information needed to represent

him prompted a lengthy exchange about the information Mr. Yannella did *not*

receive:

> Q. ... I think you said earlier in your testimony today that there was information about the identity of specific coconspirators, who was and who wasn't a coconspirator, that you believe you had insufficient information on, is that correct?
>
> A. Yes. There were people — I wanted to know from him what their involvement was.
>
> Q. And you did not get that information?
>
> A. Well, he provided me some information, but I think one of the problems was he said so many things that were obviously false and fraudulent that —
>
> Q. I'm not going to opine on that, but OK.
>
> A. Well —
>
> Q. Things that were demonstrably false, you're saying?
>
> A. He denied being in a video that he was in.
>
> Q. OK.
>
> A. There were issues raised about what he'd been told before the proffer. I just didn't believe his account of what had been — of what was said. The issue kept on arising — there was an issue about the initial charging document.
>
> Q. Yes, whether Mr. Jasper had showed him something that was fake?
>
> A. Yes. But at the same time, we would meet for a long time, and when I would run into that type of issue, I would change the topic. We would spend long periods talking about his upbringing because I was trying to build an attorney-client relationship with him, and then I would return to the case, and we watched and listened to a lot of recordings.

***

> Q. Do you believe that you had enough truthful information from Mr. Obiorah to represent him?
>
> A. I think he hampered his defense by not always being forthcoming.  And I'm not sure it was all intentional, but it was a very difficult representation.  He would cry, and when he would cry, it was very disturbing because it was sustained crying.  When he started talking about having an animal in the room, I didn't really believe that, but —
>
> Q. Did you believe that he believed that?
>
> A. No.

(*Id.* at 60-62).  Mr. Yannella believed his client was "upset" by the imminence of trial, but also believed that he was competent to discuss entering, and ultimately to enter, a guilty plea in this case.  (*Id.* at 62-63).

Finally, the Court inquired about specific instances of ineffectiveness alleged in the amended Section 2255 motion, concerning entrapment and the intended destination of the drugs.  As to the former, Mr. Yannella recalled discussing the issue of entrapment with Mr. Obiorah prior to the guilty plea, and believed that such a defense would be futile because the recordings and the information obtained from his client made plain that Mr. Obiorah was a narcotics trafficker.  (Dkt. #39 at 63-64).  The two men also discussed the destination for the drugs being the United States; Mr. Yannella reviewed the various recordings with references to U.S. and New York City landmarks, which suggested to him that arguments to the contrary would be fruitless.  (*Id.* at 64-65).[20]

---

[20]    The Court reminded Mr. Yannella of Mr. Obiorah's testimony during the *Fatico* hearing about these references being "just talk," prompting Mr. Yannella to remark that "[t]here

Following the July 11 hearing, the parties submitted post-hearing briefing.  (*See* Dkt. #45-46 (initial filings), 47-48 (reply filings)).  In January 2020, counsel for Mr. Obiorah advised the Court that Mr. Obiorah had been released from custody and returned to Nigeria, but that he continued to pursue the motion.  (Dkt. #53, 55).  The Court has taken the time to review the extensive record before it, and now resolves the motion.

## DISCUSSION

**A.     Applicable Law**

**1.     Motions Under 28 U.S.C. § 2255**

A prisoner in federal custody may seek to have his sentence vacated, set aside, or corrected on the grounds that it "was imposed in violation of the Constitution or laws of the United States, or that the [trial] court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]"  28 U.S.C. § 2255(a).  However, the grounds for such a collateral attack under Section 2255 are much more limited than those available on a direct appeal. *See United States* v. *Addonizio*, 442 U.S. 178, 185 (1979).  Relief may lie "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  *United States* v. *Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill* v. *United States*, 368 U.S. 424, 428 (1962));

---

were things he said at the *Fatico* hearing, especially at cross-examination, I wasn't confident were true or not, but I'm not the one who decides that."  (Dkt. #39 at 65).

*accord Cuoco* v. *United States*, 208 F.3d 27, 30 (2d Cir. 2000).  Generally speaking, a Section 2255 motion requires a hearing unless files and records conclusively show that the prisoner is entitled to no relief.  *See* 28 U.S.C. § 2255(b); *see also Machibroda* v. *United States*, 368 U.S. 487, 494 (1962); *Pham* v. *United States*, 317 F.3d 178, 184 (2d Cir. 2003).

### 2.   Ineffectiveness Claims on Collateral Review

One potential basis for relief under Section 2255 occurs when a defendant has received the ineffective assistance of counsel.  A defendant in a criminal proceeding has a right under the Sixth Amendment to effective assistance from his attorney at all critical stages of the proceeding; this includes entry of a guilty plea, *see, e.g., Hill* v. *Lockhart*, 474 U.S. 52, 58 (1985), and sentencing, *see, e.g., Glover* v. *United States*, 531 U.S. 198, 202-04 (2001).

In order to succeed on a claim of ineffective assistance of counsel, a movant must meet the two-pronged test established by *Strickland* v. *Washington*, 466 U.S. 668 (1984).  First, the movant must show that his counsel's representation was deficient, falling below the objective standard of reasonableness.  *See id.* at 687-88.  During this first step, the standard of review is highly deferential and includes "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  "This presumption is overcome only if counsel failed to act reasonably considering all of the circumstances."  *United States* v. *Rosemond*, 958 F.3d 111, 121 (2d Cir. 2020).  A court evaluating arguments of ineffectiveness "must avoid the distorting effects of hindsight and consider the lawyer's perspective at

the time the decision was made." *Id.* "If the attorney made a strategic choice after thoughtful consideration, that decision will be virtually unchallengeable." *Id.* Moreover, the Second Circuit has made clear that an attorney does not provide ineffective assistance by failing to raise frivolous arguments, even where requested by a client. *See, e.g., Weingarten* v. *United States*, 865 F.3d 48, 53 (2d Cir. 2017).

Next, the movant must establish that his counsel's errors resulted in actual prejudice. *See Strickland*, 466 U.S. at 694. A movant satisfies this second prong by proving that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*; *see also United States* v. *Nolan*, 956 F.3d 71, 79 (2d Cir. 2020). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Garner* v. *Lee*, 908 F.3d 845, 862 (2d Cir. 2018). In the specific context of guilty pleas, the prejudice analysis "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59; *see also Kovacs* v. *United States*, 744 F.3d 44, 51-52 (2d Cir. 2014) (discussing various ways that prejudice may be shown in guilty plea context, including a forgone decision to proceed to trial or a more advantageous plea offer).

A court is not required to conduct a *Strickland* inquiry in any particular order.  *See Strickland*, 466 U.S. at 697.  If the defendant does not successfully establish either the performance prong *or* the prejudice prong, the entire claim fails, and the remaining, unaddressed step becomes moot.  *See id.*

**B.    Analysis**

The Court begins with several observations.  First, to the extent that resolution of the instant motion depends on issues of credibility, the Court found Mr. Yannella to be more credible than Mr. Obiorah at the July 11 hearing.  At times, Mr. Obiorah testified to events with a certainty that was not borne out by the record evidence.  Of greater concern to the Court, however, was Mr. Obiorah's intermittent evasiveness in answering questions, putting forth talking points rather than truthfully responding to questions.  (*See, e.g.,* Dkt. #39 at 20 ("THE COURT: Yes, but I want you to be a layman who actually answers the questions that I asked, not the questions that I don't ask."), 21 ("THE COURT: Yes, but I want you to make sure [Mr. Obiorah] understands that he has to answer the question you ask or that I asked and not what he thinks I want to hear.")).  The Court has also considered the fact that the Government, Mr. Yannella, Judge Baer, and the Second Circuit have all found Mr. Obiorah at times to be incredible.  By contrast, Mr. Yannella's answers were measured, careful, and respectful of the partial waiver of the attorney-client privilege.  The Court also appreciated his efforts to distinguish between what he could and could no longer recall.

At base, resolution of Mr. Obiorah's claims of ineffectiveness under *Strickland* requires assessments of what Mr. Yannella knew at the time of the plea and what he did with that knowledge.[21]  Beginning with the former, Mr. Yannella was appointed to represent a client with a substantial narcotics trial scheduled to begin in approximately one month's time.  In seeking to withdraw from the case, Mr. Obiorah's prior counsel had specifically called out his client's refusal to answer questions necessary to prepare his defense.  (*See* Dkt. #19-16 at 10 (Richard Jasper: "It's not that I'm not getting answers that I want, I am not getting answers at all to certain questions.")).  Things only got worse from there:  As detailed by Mr. Yannella at the July 11 hearing, in testimony that the Court credits fully, Mr. Obiorah both declined to provide necessary information *and* repeatedly provided false information to Mr. Yannella.  *See supra* at 30-38.  And as trial approached, Mr. Obiorah exaggerated existing mental health issues in a vain attempt to forestall the proceedings, further dissipating his (and Mr. Yannella's) credibility with the Court.  Ultimately, the Court will not fault Mr. Yannella for addressing, to the best of his abilities, the changing narratives propounded by his client, and for focusing on avenues of "damage control" with respect to sentencing after, and on account of, his client's actions.  *Cf. United States* v. *Monzon*, 359 F.3d 110, 120 (2d Cir. 2004) (rejecting ineffective assistance of counsel claim premised on counsel's decision

---

[21]    Because Mr. Obiorah avers that he would have proceeded to trial instead of pleading guilty (Dkt. #46 at 12-14), the Court focuses more on the ineffectiveness prong of the *Strickland* analysis.  The Court recognizes, however, that even that prong includes an assessment of the viability of the legal claims Mr. Obiorah now advances.

to allow defendant, who had lied to counsel, to testify at suppression hearing); *Arakelian* v. *United States*, No. 04 Cr. 447 (RPP), 2009 WL 211486, at *6 (S.D.N.Y. Jan. 28, 2009) (declining to find ineffectiveness where defendant lied to counsel and court).

On this point, the Court finds it useful to outline the salient actions in which Mr. Obiorah had engaged, prior to Mr. Yannella's appointment, that informed the advice that Mr. Yannella gave.  To begin, Mr. Obiorah had been the target of a years'-long federal narcotics investigation, in the course of which he had been recorded in numerous conversations and meetings discussing narcotics transactions, including transactions involving the United States.  The other participant to many of those conversations was prepared to testify against Mr. Obiorah at any trial, and would have testified that he met Mr. Obiorah through still another international narcotics trafficker with whom Mr. Obiorah was associated (and who was not a government agent).  Further limiting the options available to Mr. Yannella was the fact that, shortly after his arrest, Mr. Obiorah had proffered with DEA agents in the hope of securing a cooperation agreement, during which proffer he provided a detailed accounting of years of narcotics trafficking on several continents.  Because it is not essential to resolution of this motion, this Court will accept, as Judge Baer did, that Mr. Obiorah was unable to obtain significant (e.g., 50-kilogram) quantities of heroin; however, given the content of the proffer, this Court does not credit (and no reasonable jury would credit) Mr. Obiorah's current arguments that "he had exaggerated his level of expertise in narcotics trafficking to convince

44

Sobrino that he was serious, using language learned through his prior work as a translator for Brazilian and Nigerian drug enforcement agents" (Dkt. #46 at 11), or that his culpability was limited to being "an intermediary in a small, one-time drug transaction" (Dkt. #19 at 10).

Having limned the procedural context in which Mr. Yannella found himself, the Court proceeds to consider the evidence provided to him by both the Government and his client prior to the guilty plea.  Chief among the Government's evidence were the many audio and video recordings that had been made of Mr. Obiorah's conversations with confidential informants over several years.  (*See* Dkt. #39 at 38-39, 44 (Mr. Yannella recounting instances in which he and Mr. Obiorah had discussed why the content of these recordings made it inadvisable for Mr. Obiorah to withdraw his guilty plea)).  The Court has identified salient portions of those communications *supra*, at pages 5 through 7, and will not restate that work here.  Suffice it to say that, contrary to Mr. Obiorah's post-hearing arguments, his conversations with El Sobrino during the period of the charged conspiracy contain repeated references to other conspirators and to a shared understanding that the one kilogram of heroin that was the subject of the September 2010 transaction was intended for distribution in the United States.[22]

---

[22]    For the first time in the post-hearing briefing, counsel for Mr. Obiorah contends that the Court may not consider the recording of his November 3, 2010 meeting with El Sobrino in the Dominican Republic, as the conversation may have been obtained in violation of the Sixth Amendment. (*See* Dkt. #46 at 9-10 (citing, *inter alia*, *Massiah* v. *United States*, 377 U.S. 201 (1964))).  For starters, no motion to suppress was made before Judge Baer, and it is far too late in the day for Mr. Obiorah to amend his Section 2255 motion to raise either a Sixth Amendment claim or an ineffectiveness claim predicated on the failure to suppress that evidence.  But more fundamentally, counsel's

In connection with the trial, the Government had also produced to Mr. Yannella numerous DEA internal reports, which detailed (i) the August 2019 commencement of an investigation into a multi-ton drug trafficking organization in which Mr. Obiorah was believed to have played a significant role; (ii) his pre-indictment discussions of heroin trafficking with one or more confidential sources that reflected his understanding of both non-government-agent co-conspirators and a New York destination for the narcotics; (iii) the September 2010 one-kilogram narcotics transaction; (iv) his post-indictment discussions of larger-scale heroin transactions involving New York; and (v) the September 2011 proffer session regarding his other involvement in narcotics trafficking.  (*See, e.g.*, Dkt. #59-1 at 12, 13, 16, 18, 26, 38, 47)**.**  The Government also had physical evidence, including the heroin that was the subject of the September 2010 transaction.  As the Government observes, the uncontested evidence in this case revealed that "(a) [Mr. Obiorah] was introduced to a confidential informant by a leader of an international drug-trafficking cartel, (b) [he] demonstrated an expertise in international drug trafficking in his recorded conversations, and (c) [he] readily found two sources

---

argument misperceives the significance of the recording.  The question is not whether the Government would have been able to introduce the evidence during Mr. Obiorah's trial; arguably, given the offense-specific nature of the Sixth Amendment, *see generally McNeil* v. *Wisconsin*, 501 U.S. 171, 175 (1991), they could have introduced it pursuant to Fed. R. Evid. 404(b).  But the Court need not decide that issue.  The real question is whether Mr. Yannella could consider the recording as a cross-check on the veracity of his client's pre-indictment recorded statements, as well as his client's contemporaneous statements to him, on the issues of non-government-agent co-conspirators and the shared intention to import narcotics into the United States.  He most certainly could, and it was not ineffective for him to do so in this case.

of supply to provide a large quantity of heroin for exportation to the United States."  (Dkt. #47 at 4).

But equally important to the advice Mr. Yannella provided was the information he received from Mr. Obiorah.  As noted, Mr. Obiorah was not always forthcoming with his counsel, to the detriment of his defense.  However, Mr. Yannella recalled instances in which his client would "step back from that and tell us about who he was and what his history was."  (Dkt. #39 at 42).  And that history was of an individual involved in international narcotics trafficking, if perhaps not on the scale that Mr. Obiorah had suggested in his November 2010 conversation with El Sobrino in the Dominican Republic.  Mr. Yannella had also discussed with his client the most inculpatory portions of the Government's recordings, including his references to other culpable conspirators and El Sobrino's references to New York.  Mr. Yannella would remind his client of the content of these conversations when Mr. Obiorah considered withdrawing his plea.  (*See, e.g.*, Dk. #39 at 44 (recalling "all the recordings where [Mr. Obiorah] talks about my people want to meet you, too, or my people want to see you do a transaction before we do it, times where he'd mentioned other people"), 57 (recounting visit where he "went through all the calls with [Mr. Obiorah] again and all the instances where [Mr. Obiorah] had said in many different ways that his people could move drugs to Canada to get into the U.S., get a boat, get a plane")).

Considering now Mr. Obiorah's specific claims of ineffectiveness, the Court begins with a set of claims addressing the adequacy of Mr. Yannella's

47

preparation of Mr. Obiorah for his guilty plea.  In this regard, Mr. Obiorah argues that counsel's inadequate legal research and inattention to the factual record caused him to advise Mr. Obiorah improperly regarding the nature of the charges against him and, more specifically, the legal requirements that a conspiratorial agreement be with an individual who is not a government agent and that the conspirators intend the narcotics to be imported into, and distributed in, the United States.  (Dkt. #46 at 5-9).  As an initial matter, the Court observes that these argument are predicated on a distortion of Mr. Yannella's knowledge of the law.  While Mr. Yannella conceded that he did not perform contemporaneous research into the law of conspiracy or the requisite intent, he explained that such research would have been unnecessary given his pre-existing knowledge of the law.  (Dkt. #39 at 45-47 (knowing that an individual cannot conspire with a government agent), 51-52 (knowing the specific intent required)).  There is also no suggestion from Mr. Obiorah's counsel that Mr. Yannella's testimony reflects some misperception of the law. And the Court credits Mr. Yannella's testimony that he specifically advised Mr. Obiorah prior to the plea that (i) "the government would be able to prove that he had conspired with a coconspirator" who was not a government agent (*id.* at 53) and (ii) "[Mr. Obiorah] could only be guilty of this conspiracy charge if his coconspirators intended to import drugs into the United States" (*id.* at 54-55).

These claims are also notable for their tension with Mr. Obiorah's plea proceeding, where he was correctly advised of the elements of Counts One and Two (Crim. Dkt. #30 at 7-8), and where he specifically allocuted under oath

that (i) he "agreed with others to distribute 1 kilogram of heroin" and "agreed with others to import into New York 1 kilogram of heroin"; (ii) these "others" included, at the very least, Estonement, who was not a government actor; and (iii) he knew that the heroin was destined for New York (*id.* at 13-14). *See generally Blackledge* v. *Allison*, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity."). These claims similarly exist in tension with the findings of Judge Baer *and* the Second Circuit that Mr. Obiorah's guilty plea was legally sufficient. (*See* App. Dkt. #23 at 187 (Judge Baer: "[T]here really is no reason to suspect that [Mr. Obiorah] didn't import these drugs or plan to into the United States, whether it is New York or New Jersey, and that he didn't do it in concert with at least one other culpable conspirator")). *See also Obiorah*, 536 F. App'x at 55 ("Obiorah asserts that no evidence establishes that he conspired with an individual who was not a government agent, and he claims that he would not have pleaded guilty had he been informed that such an agreement was required. We are not persuaded."), 56 (rejecting defense argument that "Estonement did not know that the drugs were intended for the United States and, thus, lacked the knowledge and specific intent necessary to be a co-conspirator in crimes to be committed in the United States"); *see also United States* v. *Pitcher*, 559 F.3d 120, 123 (2d Cir. 2009) ("It is well established that a § 2255 petition cannot be used to relitigate questions which were raised and considered on direct appeal." (internal quotation marks omitted)).

Given this record, Mr. Obiorah is left to claim that Mr. Yannella provided constitutionally ineffective assistance because of his "inability to identify any evidence that any coconspirator intended the drugs at issue to enter the United States, as required under the statute, and his failure to inform Mr. Obiorah of who the Government could establish was his co-conspirator." (Dkt. #46 at 5). The claim fails. Working in reverse order, Mr. Yannella had several non-government-agent conspirators from whom to choose: The Government's evidence, which included Mr. Obiorah's own proffer statements, referenced "Emmanuel, Tony, Estonement, somebody they called 'Old Man,' someone named 'Mr. Sunday.'" (Dkt. #39 at 53-54). Of these, Estonement plainly suffices, and he was named specifically by Mr. Obiorah in his allocution. Furthermore, the Court will not penalize Mr. Yannella for his client's refusal to provide specific information to his attorney regarding the respective roles of the co-conspirators, which refusal required Mr. Yannella to ferret out this information from the Government's production and his client's unguarded comments. (*Id.*). On the issue of the co-conspirators' shared intent to import the narcotics in the United States, the Court acknowledges the absence of "hard documentary evidence, that any coconspirator ... intended for the drugs to end up in the United States." (*Id.* at 54). Here, too, however, the Court agrees with Mr. Yannella's logic: There was no disputing the conspiracy to distribute one kilogram of heroin. To Mr. Yannella, therefore, "[w]hether or not they were part of the conspiracy *to import heroin into the United States* ... came more from Mr. Obiorah's own words in a whole series of phone conversations."

50

(*Id.* at 54).  It was not ineffective for him to intuit this intent — particularly where his client was providing inconsistent, if not demonstrably false, information.  What is more, given the international scope of the narcotics trafficking engaged by certain of these co-conspirators, as well as El Sobrino's fixation with reminding Mr. Obiorah that the heroin was destined for New York, the requisite intent for Mr. Obiorah's co-conspirators would likely have been satisfied under a conscious avoidance theory even absent direct evidence. *Compare United States* v. *MacPherson*, 424 F.3d 183, 189-90 (2d Cir. 2005) ("The law … recognizes that the *mens rea* elements of knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom."), *with Obiorah*, 536 F. App'x at 56 (citing *United States* v. *Londono-Villa*, 930 F.2d 994, 1000-01 (2d Cir. 1991), for the proposition that a co-conspirator may not escape conviction for drug importation by consciously avoiding knowledge that drugs were intended for United States), *and United States* v. *Flores*, 945 F.3d 687, 714 (2d Cir. 2019) (same), *cert. denied sub nom. Flores de Freitas* v. *United States*, 141 S. Ct. 375 (2020).

Similar logic compels this Court to reject Mr. Obiorah's claim that Mr. Yannella was ineffective in failing to advise him of the "potentially meritorious defense" that the Government lacked jurisdiction.  (Dkt. #46 at 9-10).  Under *Strickland*, "strategic choices made [by counsel] after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the

limitations on investigation." 466 U.S. at 690-91. A "lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision." *Greiner* v. *Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *DeLuca* v. *Lord*, 77 F.3d 578, 588 n.3 (2d Cir. 1996)). "The likelihood that an affirmative defense will be successful at trial and an assessment of the probable increase or reduction in sentence relative to the plea if the defendant proceeds to trial are clearly relevant to the determination of whether an attorney acted competently in recommending a plea." *Panuccio* v. *Kelly*, 927 F.2d 106, 109 (2d Cir. 1991).

If Mr. Obiorah and his counsel truly believed that the Government had failed to prove a jurisdictional nexus in this case, they should have so moved. *See United States* v. *Archuleta*, No. 02 Cr. 1060 (LAP), 2018 WL 8646703, at *3 (S.D.N.Y. July 31, 2018) (finding that "a challenge to the Court's subject matter jurisdiction over Defendant is a 'federal basis for relief'" that can be brought under 28 U.S.C. § 2255, but dismissing motion as a second or successive motion for which no leave had been sought); *cf. United States* v. *Ruiz*, 536 U.S. 622, 628 (2002) (noting that a federal court always has jurisdiction to determine its own jurisdiction). But for the reasons just stated, this Court finds that the evidence supported jurisdiction over Mr. Obiorah for both the distribution and the importation conspiracies. *See United States* v. *Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011) ("For non-citizens acting entirely abroad, a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests."), *cert. denied*, 566 U.S. 986

(2012).  It was therefore not ineffective for Mr. Yannella to fail to advise him

otherwise.  *See generally Thomas* v. *United States*, No. 15 Cr. 667-10 (KPF),

2020 WL 1285622, at *5 (S.D.N.Y. Mar. 18, 2020) ("The Second Circuit has

made clear that an attorney does not provide ineffective assistance by failing to

raise frivolous arguments, even where requested by a client." (citing

*Weingarten*, 865 F.3d at 53)).

Mr. Obiorah's final claim concerns Mr. Yannella's failure to advise him of

the defense of entrapment.  (Dkt. #46 at 10-12).  Here, too, the Court

concludes that the defense lacked merit.  The affirmative defense of entrapment

consists of "two related elements: government inducement of the crime, and a

lack of predisposition on the part of the defendant to engage in the criminal

conduct."  *Mathews* v. *United States*, 485 U.S. 58, 63 (1988) (citations omitted);

*see generally United States* v. *Flores*, 945 F.3d 687, 717 (2d Cir. 2019), *cert.

denied sub nom. Flores de Freitas* v. *United States*, 141 S. Ct. 375 (2020).  To

successfully assert an entrapment defense, "the defendant has the burden to

produce 'some credible' evidence — but need not prove by a preponderance of

the evidence — that the government induced him to commit the crime."  *United

States* v. *Cabrera*, 13 F.4th 140, ___, 2021 WL 4073056, at *4 (2d Cir. Sept. 8,

2021).  "[I]f inducement is shown, the prosecution has the burden of proving

predisposition beyond a reasonable doubt."  *United States* v. *Cromitie*, 727 F.3d

194, 204 (2d Cir. 2013) (citations omitted).

"Predisposition, the principal element in the defense of entrapment,

focuses upon whether the defendant was an unwary innocent or, instead, an

unwary criminal who readily availed himself of the opportunity to perpetrate the crime." *Mathews*, 485 U.S. at 63 (citations and internal quotation marks omitted). "A defendant is predisposed to commit a crime if he is 'ready and willing without persuasion' to commit the crime charged and 'awaiting any propitious opportunity' to do so." *United States* v. *Salerno*, 66 F.3d 544, 547 (2d Cir. 1995) (quoting *United States* v. *Harvey*, 991 F.2d 981, 992 (2d Cir. 1993)). Predisposition may be shown by evidence of "[i] an existing course of criminal conduct similar to the crime for which [the defendant] is charged, [ii] an already formed design on the part of the accused to commit the crime for which he is charged, or [iii] a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement." *Id.* at 548 (quoting *United States* v. *Valencia*, 645 F.2d 1158, 1167 (2d Cir. 1980)); *accord Cabrera*, 2021 WL 4073056, at *8.[23]

Mr. Yannella both understood the requirements of an entrapment defense (Dkt. #39 at 52-53) and discussed the defense with Mr. Obiorah prior to his plea (*id.* at 63-64). He correctly concluded that the defense was not a

---

[23]   *See also United States* v. *Sampson*, No. 13 Cr. 269 (DLI), 2015 WL 2066073, at *9 (E.D.N.Y. May 4, 2015):

> With regard to what is considered "criminal conduct similar to that which the defendant is charged," conduct that is "morally indistinguishable" and "of the same kind" is considered sufficiently similar. *See United States* v. *Viviano*, 437 F.2d 295, 299 n.3 (2d Cir. 1971); *United States* v. *Williams*, 705 F.2d 603, 623 (2d Cir. 1983). Defendant argues that the "morally indistinguishable" standard is outdated. (Def.'s Letter at 5.) However, the Second Circuit has not overruled this standard and the cases relied on by Defendant do no more than articulate the ways in which the government can rebut an entrapment defense.

viable option.  Mr. Obiorah has not identified evidence of inducement, and the circumstances of El Sobrino's introduction to Mr. Obiorah would not necessitate such a finding.  But even were the Court to find the inducement element satisfied, the evidence discussed throughout this Opinion — including in particular Mr. Obiorah's detailed proffer statements to the DEA about his wide-ranging narcotics trafficking — would have more than satisfied the Government's burden of proving predisposition.

***

Mr. Yannella found himself on the eve of trial with a mercurial client who vacillated between providing insufficient, inconsistent, and false information. He focused immediately on the best interests of his client, whether that involved examining Mr. Obiorah to ascertain his competence, moving several times for the adjournment of trial, or, as trial approached and his client's malingering became known, preparing his client adequately to plead guilty. From there, Mr. Yannella pivoted to focus on the sentencing, and he ultimately persuaded Judge Baer to impose a sentence that was effectively one-third of what the Government sought.  Arguably, given Judge Baer's attention to the factors listed in 18 U.S.C. § 3553(a), he might have obtained an even lower sentence had Mr. Obiorah not lied in his efforts to qualify for safety-valve relief. Mr. Yannella did his best with the client, and the case, that he inherited, and this Court will not find him to have provided ineffective assistance of counsel in connection with Mr. Obiorah's guilty plea.

## CONCLUSION

For the reasons set forth in the remainder of this Opinion, the Court DENIES Mr. Obiorah's motion pursuant to 28 U.S.C. § 2255 to vacate his conviction.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.  The Clerk of Court is further directed to modify the caption of the case as indicated above.

A certificate of appealability shall be not granted, because Mr. Obiorah has not made a substantial showing of a denial of a federal right and appellate review is, therefore, not warranted.  *Hoffler* v. *Bezio*, 726 F.3d 144, 154 (2d Cir. 2013); *Tankleff* v. *Senkowski*, 135 F.3d 235, 241 (2d Cir. 1998).  In addition, the Court certifies, under 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal.  *See Coppedge* v. *United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

Dated:   October 8, 2021
        New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

56